JOURNAL ENTRY and OPINION
{¶ 1} Defendant-appellant, Tonica Jenkins ("Jenkins"), appeals her convictions and sentences for two counts of tampering with evidence, attempted aggravated murder, kidnapping, complicity to commit aggravated murder, and felonious assault. Finding no merit to the appeal, we affirm.
 {¶ 2} Jenkins was charged in a multi-count indictment with attempted aggravated murder, tampering with records, kidnapping, complicity in the commission of aggravated murder, felonious assault, and two counts of tampering with evidence. After several continuances and speedy trial waivers, the case proceeded to a jury trial where the following evidence was presented.
 {¶ 3} The victim, Melissa Latham ("Latham") testified that in the early morning hours of April 20, 2001, she was walking along Euclid Avenue in East Cleveland when she was approached by three individuals in a red car. A black female exited the car, introduced herself as "Michelle," and asked Latham if she was interested in participating in an insurance scam. Latham admitted at trial that, because she was addicted to crack cocaine, she was interested in making money quickly and agreed to participate. She got into the car with Michelle and another black female and a male named Kyle Martin ("Martin"). Michelle was later identified as Michelle Sharp ("Sharp").
 {¶ 4} Jenkins, Martin, Latham, and Sharp proceeded to Sharp's house where Jenkins gave Latham some money from the insurance scam. Next, they purchased drugs in a neighborhood parking lot and went for food at a nearby restaurant. They left the restaurant sometime between 4:00 and 5:00 a.m., took Sharp to her house, and proceeded to a house on Delmont Avenue in East Cleveland ("the house").
 {¶ 5} Latham testified that she entered the house through a side door and followed Jenkins and Martin into the basement where Martin and Latham got high and went to sleep. The next morning, Latham prepared to go to a dental appointment as part of the insurance scam. Jenkins gave her a purple sweatshirt to wear.
 {¶ 6} Jenkins, Martin, and Latham drove to a dental office in Strongsville. Martin remained in the car while Jenkins and Latham entered the dental office. Latham testified that when a receptionist gave her some forms to fill out, Jenkins grabbed them and filled them out with the name "Tonica Jenkins." Latham's name did not appear on any of the forms. Latham and the receptionist, Aliceson Farabaugh, both testified that insurance information on the forms indicated "self-pay," i.e, the patient had no insurance. Latham also testified that Jenkins instructed her to wear black gloves inside the dental office and not take them off. If asked, Latham was to say there was something wrong with her hands. The dentist cleaned, examined, and x-rayed her teeth, and Latham paid the dental bill with the cash Jenkins gave her.
 {¶ 7} When Latham exited the dental office, Martin and Jenkins were waiting for her in the car. They drove to a KFC restaurant, purchased some food, and drove back to East Cleveland, where Martin purchased more drugs.
 {¶ 8} Latham testified that upon returning to the house she got "high" with Martin in the basement and fell asleep around midnight. Latham explained that she stayed at the house because Jenkins promised her she could make "easy money" going to another dental visit.
 {¶ 9} When she awoke Saturday afternoon, Latham assumed she would be going to another dental office. She reached to turn on a light in the basement and found it was burned out. Latham then used the bathroom located in the basement. Jenkins instructed her to stay inside the bathroom until she told her to come out.
 {¶ 10} As she walked out of the bathroom into the dark basement, someone attempted to punch Latham. When the lights came on, Martin grabbed her by the neck and pushed her to the floor. Jenkins and Martin began kicking and stomping her, while she fought back.
 {¶ 11} Latham stated that Martin held her down by putting his knee to her neck while holding her arms down. Latham continued to struggle and bit Martin on his forearm. As Martin held her down, Jenkins used a syringe to inject something into Latham's arms and legs. Latham testified that Jenkins injected her with a needle 15 to 16 times before Martin struck the back of her head with a brick.
 {¶ 12} After the third blow to her head, Latham pretended to be dead. She heard Jenkins tell Martin she wanted to place her home detention bracelet on Latham's leg and wrap Latham's body for burning. After Latham heard them leave the basement, she attempted to open the door but discovered the doorknob was missing. She found a spoon and used it to open the door and escape.
 {¶ 13} Latham ran across the street to a KFC restaurant, where she asked the employees to call 911. East Cleveland police arrived, but before Latham could tell them what happened, Jenkins entered the restaurant and accused her of stealing money from her.
 {¶ 14} Latham received medical treatment at Huron Road Hospital. Dr. George Stephens ("Dr. Stephens") testified that when Latham arrived in the emergency room, she was awake but soon lost consciousness and became comatose. He determined that Latham's blood sugar was extremely low.
 {¶ 15} Once Latham's condition was stabilized, Latham told Dr. Stephens that she was not diabetic but had received injections of insulin. Accordingly, Dr. Stephens ordered two tests, including a C-Peptide test, which detects the presence of injected insulin. Dr. Stephens explained that insulin produced naturally by the body is different from insulin injected into the body. Injected insulin does not contain significant amounts of C-Peptide. The test results revealed the C-Peptide level was normal, indicating that insulin was injected into Latham's body. Further, Dr. Stephens explained that Latham's elevated insulin level was not caused by any disease or any naturally occurring condition and that it could only result from insulin injected into her body.
 {¶ 16} Just before EMS took Latham to the hospital, she told police to look in the basement of the house on Delmont for a pool of blood. Officer Terry Wheeler ("Wheeler") testified that Jenkins was detained by police but was not arrested at that time. Det. Lewis Turner ("Turner") searched the area for a male suspect and found Martin and another male. Det. Turner testified that Martin was evasive upon questioning and sweating profusely. The detective observed scratches on Martin's head, face, neck, and hands, and what appeared to be blood on his hands. Det. Turner arrested Martin, who later provided the police with a written statement which implicated Jenkins and her mother, Tonica Clement.
 {¶ 17} Officer Gary Harper ("Harper") interviewed Martin and Latham. As part of his investigation, he and his partner, Officer Michael Cardilli searched the area around the house on Delmont where they found a blood-stained brick.
 {¶ 18} Officer Anthony Tomaro ("Tomaro") testified that Jenkins allowed him and Officer Ellison to examine the house on Delmont. Jenkins told him she did not have house keys and that they would have to wait a few minutes for her elderly parents to open the door. Jenkins entered the house first in order to secure the dogs. When the officers entered the basement, they found Jenkins' mother, Tonica Clement ("Clement"), at the bottom of the stairs holding a rag. Officer Tomaro testified that upon entering the basement, he detected a strong odor of bleach. When he asked Clement what she was doing, she told him that she was cleaning up a mess made by the dogs. Officer Tomaro testified that he found no evidence of dog feces in the basement but noticed blood stains on the stairs, the floor, and a wooden table.
 {¶ 19} The officers later obtained a search warrant for the house. They seized a file cabinet and a rug from the basement, both of which contained blood stains. Special Agent John Saray from the Ohio Bureau of Criminal Identification and Investigation ("BCI") testified that he was present when the search warrant was executed, and that he conducted a preliminary test on the file cabinet which revealed the presence of blood. The police officers also found two syringes, a crack pipe, a spoon, and documents containing Tonica Jenkins' name and social security number.
 {¶ 20} BCI forensic scientist Heather Bizub testified that she tested the blood found on the brick and the file cabinet and determined that the DNA from the blood on these items matched Latham's DNA.
 {¶ 21} Acting on leads from his investigation, Detective Curtis Jackson ("Jackson") looked in the telephone directory for the names of dental offices in Strongsville. He called Pearl Dental Practice and inquired if the dental office had a patient named Tonica Jenkins. Det. Jackson testified that he went to the Pearl Dental Practice, where he spoke with two employees. The employees did not identify Jenkins' photo as the person who gave her name as Tonica Jenkins at the appointment on April 20.
 {¶ 22} The receptionist at the dental office, Aliceson Farabaugh, testified that she made an appointment for April 20 for a new patient named Tonica Jenkins. Farabaugh further testified that at the time of the appointment, two women entered the office. Farabaugh identified a photo of Latham as the woman she thought was the new patient, Tonica Jenkins. Farabaugh identified Jenkins in court as the second woman.
 {¶ 23} Det. Jackson also interviewed David Smith ("Smith"), who lived at the Community Circle Apartments. He checked the visitor's log sheet for names of individuals who went to see Smith. Det. Jackson testified that he had information that two females and one male went to visit Smith the night before the attack on Latham. The visitor log sheet revealed that on April 20, Sharp visited Smith at 3:05 a.m.
 {¶ 24} Det. Jackson showed Smith photos of Jenkins and co-defendant Clement. Smith identified Jenkins as being with Sharp and an unidentified male. Det. Jackson subsequently interviewed Sharp, who also testified at trial.
 {¶ 25} Sharp testified that Jenkins and Martin had approached her about participating in an insurance scam. Sharp admitted she was addicted to drugs and alcohol at the time and that she was interested in participating in the scam. However, upon further discussion, she learned that she was inappropriate for the scam because she did not fit the "profile" Jenkins and Martin were looking for. When Jenkins asked if Sharp knew anyone else who might be interested in the scam, she suggested they visit Smith, who had many visitors to his apartment.
 {¶ 26} Smith was alone in his apartment when they arrived. Sharp admitted that she and Martin smoked crack cocaine at Smith's apartment before Jenkins drove her home. Sharp testified that on the way to her house, they saw a young woman walking down the street. They stopped and asked the woman if she was interested in participating in an insurance scam. Sharp explained that the woman, Melissa Latham, agreed to join them and got into the car.
 {¶ 27} After police obtained a written statement from Martin implicating Jenkins, Detective Tiffany Cleveland and another officer went to the house on Delmont to arrest Jenkins. However, someone at the house informed them that Jenkins and her mother were in Florida. Det. Cleveland testified that she contacted the U.S. Attorney's office in Florida as well as the local police department for the purpose of arresting Jenkins. United States Customs Agent, Carroll Grant ("Agent Grant") testified that Jenkins had federal drug charges pending in Florida. Agent Grant further testified that Jenkins' drug trial was scheduled to begin on April 23, 2001, and that she had been placed in an electronic home monitoring program in Cleveland while awaiting trial. Agent Grant explained that an electronic monitoring bracelet was placed on her leg but had malfunctioned.
 {¶ 28} Robin Lafferty, a home confinement specialist with the United States Pretrial Services Office for the federal court in Ohio testified that her office was providing supervision for the Florida federal court. Specialist Lafferty further testified that the electronic monitoring was terminated on March 5, 2001.
 {¶ 29} At the conclusion of the trial in the instant case, the jury found Jenkins guilty of two counts of tampering with evidence, one count of attempted aggravated murder, one count of kidnapping, one count of complicity to commit aggravated murder, and one count of felonious assault.
 {¶ 30} The court sentenced Jenkins to ten years in prison for attempted aggravated murder, four years for felonious assault, four years for kidnapping, six years for complicity to commit aggravated murder, and two years for each count of the tampering with evidence convictions, to run concurrently with each other. The court ordered the four years for kidnapping to be served consecutively to the six years for complicity to commit aggravated murder. The court also ordered the aggregate ten years for kidnapping and complicity to commit aggravated murder to be served consecutively to the ten years for attempted aggravated murder. The attempted aggravated murder and felonious assault convictions were merged for purposes of sentencing. The terms of incarceration in this case totaled 20 years. The court ordered that the sentence in this case be served consecutively with the time Jenkins was currently serving in federal prison.
 {¶ 31} Jenkins appeals, raising nine assignments of error.
 In-Court Identification {¶ 32} In her first assignment of error, Jenkins argues the trial court violated her constitutional right to due process by allowing the State's witnesses to offer an in-court identification of her after the witnesses' identification was tainted by an unfairly suggestive photo array. Specifically, Jenkins argues the display of only two photos (one of Jenkins and one of co-defendant Clement) to witnesses during the investigation of this case, was impermissibly suggestive. Jenkins also argues the trial court erred when it did not allow defense counsel to question Farabaugh about her ability to identify individuals of a different race or ethnicity.
 {¶ 33} When a witness has been confronted with a suspect before trial, a court is not required to suppress an identification of the suspect unless the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances. In reHenderson, Cuyahoga App. No. 79716, 2002-Ohio-4. This court has held that, even presuming a pretrial identification procedure is impermissibly suggestive, an in-court identification is permissible where the prosecution establishes by clear and convincing evidence that the witness had a reliable, independent basis for the identification based on prior independent observations made at the scene of the crime. State v. Tate,
Cuyahoga App. 81577, 2003-Ohio-1835, citing In re Henderson,
Cuyahoga App. No. 79716, 2002-Ohio-483. Moreover, no due process violation will be found where an identification does not stem from an impermissibly suggestive confrontation but is instead the result of observations at the time of the crime. Id.
 {¶ 34} In order to determine the reliability of the identification, a court must consider (1) the witness's opportunity to view the suspect at the time of the incident, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description, (4) the witness's certainty when identifying the suspect at the time of the confrontation, and (5) the length of time elapsed between the crime and the identification. State v. Waddy (1992), 63 Ohio St.3d 424, 439, citing Neil v. Biggers (1972), 409 U.S. 188, 199-200,93 S.Ct. 375, 382.
 {¶ 35} With the exception of Aliceson Farabaugh, Jenkins does not specify which of the State's witnesses made an in-court identification of Jenkins.[1] However, there is evidence that Farabaugh had time to observe Jenkins and Latham when they entered the reception area. The detectives came to the dental office to question Farabaugh within days of Jenkins' visit. Indeed, all of the witnesses questioned during the investigation were presented with photos of Jenkins just days after Latham was injured. Moreover, Farabaugh testified that she could identify Latham, and her testimony regarding Latham's and Jenkins' clothing was corroborated by Latham's testimony. Therefore, the State established by clear and convincing evidence that Farabaugh had a reliable independent basis, apart from the photos, for identifying Jenkins.
 {¶ 36} Accordingly, the first assignment of error is overruled.
 Effective Assistance of Counsel {¶ 37} In her second assignment of error, Jenkins argues she was denied her right to effective assistance of counsel because her attorney failed to pursue the suppression of identification testimony. Jenkins also claims she was denied her right to effective assistance of counsel because her attorney failed to raise the issue of speedy trial.
 {¶ 38} In a claim of ineffective assistance of counsel, the burden is on the defendant to establish that counsel's performance fell below an objective standard of reasonable representation and prejudiced the defense. State v. Bradley
(1989), 42 Ohio St.3d 136, paragraph two of the syllabus; Statev. Lytle (1976), 48 Ohio St.2d 391, vacated on other grounds (1978), 438 U.S. 910; and Strickland v. Washington (1984),466 U.S. 668. Hence, to determine whether counsel was ineffective, Jenkins must show that (1) "counsel's performance was deficient," in that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment," and (2) counsel's "deficient performance prejudiced the defense," in that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington (1984),466 U.S. 668, 687.
 {¶ 39} In Ohio, a properly licensed attorney is presumed competent. Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301. In evaluating whether a petitioner has been denied effective assistance of counsel, the Ohio Supreme Court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." State v.Hester (1976), 45 Ohio St.2d 71, paragraph four of the syllabus. When making that determination, a court must determine "whether there has been a substantial violation of any of defense counsel's essential duties to his client" and "whether the defense was prejudiced by counsel's ineffectiveness." State v.Lytle (1976), 48 Ohio St.2d 391, 396, and State v. Calhoun
(1999), 86 Ohio St.3d 279, 289. To show that a defendant has been prejudiced, the defendant must prove "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley, at paragraph three of the syllabus; and Strickland, supra, at 686.
 {¶ 40} Here, we cannot say that Jenkins' counsel was ineffective for not pursuing suppression of identification testimony because Jenkins has not demonstrated that the outcome of the case would have been different if there had been a suppression hearing. As previously explained, there was clear and convincing evidence that Farabaugh had an independent basis for identifying Jenkins apart from the photos. Although Jenkins fails to specifically identify which of the State's other witnesses made in-court identifications and were allegedly tainted by suggestive photos, the evidence demonstrates that all witnesses questioned during the investigation of this case were questioned shortly after the incident, when memories were still fresh and thus reliable. Therefore, because a suppression hearing would not have eliminated Farabaugh's in-court identification, Jenkins has failed to demonstrate that the outcome of the trial would have been different if there had been a suppression hearing.
 {¶ 41} Jenkins' speedy trial argument is similarly without merit. Jenkins asserts her trial counsel was ineffective because he failed to alert the court that the State failed to bring her to trial within 270 days as required by the speedy trial statute. R.C. 2945.71(C)(2) requires a felony defendant "be brought to trial within two hundred seventy days after his arrest." Jenkins claims that because she "was arrested on April 21, 2001, the statutory time for speedy trial expired on January 17, 2002; 270 days after her arrest."
 {¶ 42} However, the record does not support Jenkins' claim that she was arrested on April 21, 2001. To the contrary, there is testimony demonstrating that on April 24, 2001, East Cleveland police went to Jenkins' home to arrest her and found that she had traveled to Florida. Moreover, court records indicate that Jenkins was not in police custody until January 1, 2002. Therefore, Jenkins' right to a speedy trial was not violated.
 {¶ 43} Accordingly, the second assignment of error is overruled.
 Cross-Examination of Witnesses {¶ 44} In her third assignment of error, Jenkins argues the trial court erred by preventing her from fully cross-examining certain witnesses. Specifically, she claims the trial court erred when it refused to allow her counsel to cross-examine Farabaugh about her ability to identify Jenkins independent of the display of photos. Jenkins asserts she should have been permitted to question Farabaugh about the number of minority patients in the Pearl Dental Practice. Jenkins also claims the trial court abused its discretion in refusing to allow her counsel to question Dr. Stephens about the effects that Latham's HIV-positive condition would have on her metabolism and blood sugar levels.
 {¶ 45} The admission or exclusion of evidence rests within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 510 N.E.2d 343. In order to find an abuse of that discretion, we must determine whether the trial court's decision to admit or exclude the evidence was arbitrary, unreasonable, or unconscionable and not merely an error of judgment. State v. Xie (1992), 62 Ohio St.3d 521,584 N.E.2d 715.
 {¶ 46} Evid.R. 611(B) states: "cross-examination shall be permitted on all relevant matters and matters affecting credibility."
 {¶ 47} However, Evid.R. 611 must be balanced with Evid.R. 403(B). State v. Rigor (Dec. 14, 2000), Cuyahoga App. No. 76201. Evid.R. 403(B) states:
"Although relevant, evidence may be excluded if its probativevalue is substantially outweighed by considerations of unduedelay, or needless presentation of cumulative evidence."
 {¶ 48} Here, the evidence that Latham was HIV-positive was not relevant to testimony regarding the source of insulin found in Latham's body. Dr. Stephens testified that tests were conducted which proved the insulin in Latham's body was injected and was not the product of disease. Therefore, evidence that Latham was HIV-positive was irrelevant and could potentially be unfairly prejudicial.
 {¶ 49} Similarly, inquiry as to the number of minority patients seen at the Pearl Dental Practice was also irrelevant. Farabaugh testified that she was able to identify Jenkins and Latham because their unusual behavior left a lasting impression in her mind. Therefore, the trial court did not abuse its discretion by prohibiting counsel's cross-examination on these issues.
 {¶ 50} Accordingly, the third assignment of error is overruled.
 State's Questioning of a Witness Invoking the Fifth Amendment {¶ 51} In her fourth assignment of error, Jenkins argues the trial court violated her due process rights by allowing Kyle Martin to testify, even thought the court had notice that he intended to assert his Fifth Amendment right against self-incrimination. Jenkins also argues that the trial court erred in failing to instruct the jury to disregard and draw no conclusions from Martin's failure to testify.
 {¶ 52} The Ohio Supreme Court addressed this issue in Statev. Dinsio (1964), 176 Ohio St. 460. The Dinsio court held that, in a criminal case where a witness properly invokes his right against self-incrimination under the Fifth Amendment, it is improper for the court to prohibit such a witness from being called to the stand, regardless of whether counsel knows that the witness will refuse to testify. The Dinsio court stated:
"A witness, even though he has previously indicated that hewill refuse to testify on the ground that to do so wouldincriminate him, may be called as a witness.
 As stated in State v. Snyder (1953), 244 Iowa 1244, 1248,`the general rule is, as stated in 58 Am. Jur., Witnesses,Section 53, that although a witness cannot be compelled to giveincriminating testimony, he must if properly summoned appear andbe sworn. His privilege is available only as a witness and cannotbe extended so as to excuse him from appearing.'" Dinsio, at466.
 {¶ 53} Thus, the court must permit counsel to call a witness to the stand even if the court has prior knowledge that the witness will exercise his right not to testify. The court has no power to prohibit a witness from taking the stand based solely on the knowledge that the witness will refuse to testify. See, also,Columbus v. Cooper (1990), 49 Ohio St.3d 42.
 {¶ 54} Here, there is nothing in the record to suggest that the State improperly posed repeated questions aimed at eliciting the assertion of the Fifth Amendment privilege. The simple act of calling Martin as a witness knowing he would assert the privilege, in and of itself, was not improper. Moreover, contrary to Jenkins' assertion that the court failed to instruct the jury to disregard Martin's invocation of the privilege, the court properly gave a curative instruction in its charge to the jury. (Tr. 894).
 {¶ 55} Accordingly, the fourth assignment of error is overruled.
 Prosecutorial Misconduct {¶ 56} In her fifth assignment of error, Jenkins argues she was unfairly prejudiced by prosecutorial misconduct. Jenkins claims the State acted improperly by presenting evidence that she failed to contact the police to give a statement, by raising inflammatory questions during the redirect examination of an unidentified witness about "burning bodies," and by commenting during closing arguments about Martin's refusal to testify.
 {¶ 57} Generally, conduct of a prosecuting attorney at trial is not grounds for reversal unless the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987),33 Ohio St.3d 19. In State v. Smith, the Ohio Supreme Court held the test for prosecutorial misconduct is whether the remarks were improper and, if so, whether the rights of the accused were materially prejudiced. State v. Smith (1984), 14 Ohio St.3d 13,14.
 {¶ 58} Further, prosecutors are entitled to wide latitude during closing arguments. State v. Brown (1988),38 Ohio St.3d 305. In Smith v. Phillips (1982), 455 U.S. 209, 102 S.Ct. 940,71 L.Ed.2d 78, the United States Supreme Court stated that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. The effect of the prosecutor's alleged misconduct must be considered in light of the whole trial. State v. Maurer (1984), 15 Ohio St.3d 239,473 N.E.2d 768.
 {¶ 59} As a preliminary matter, we note that Jenkins has failed to identify those portions of the record where she claims the State posed improper questions about "burning bodies." App.R. 16(A) provides, in pertinent part:
"(A) Brief of the Appellant. The appellant shall include inits brief, under the headings and in the order indicated, all ofthe following:
* * *
(7) An argument containing the contentions of the appellantwith respect to each assignment of error presented for review andthe reasons in support of the contentions, with citations to theauthorities, statutes, and parts of the record on which appellantrelies. The argument may be preceded by a summary.
* * *
(D) References in Briefs to the Record. References in thebriefs to parts of the record shall be to the pages of the partsof the record involved; e.g., Answer p. 7, Motion for Judgment p.2, Transcript p. 231. Intelligible abbreviations may be used. Ifreference is made to evidence, the admissibility of which is incontroversy, reference shall be made to the pages of thetranscript at which the evidence was identified, offered, andreceived or rejected." (Emphasis added.)
 {¶ 60} Further, App.R. 12(A)(2) provides:
"The court may disregard an assignment of error presented forreview if the party raising it fails to identify in the recordthe error on which the assignment of error is based or fails toargue the assignment separately in the brief, as required by App.R. 16(A)."
 {¶ 61} Here, Jenkins does not reference where in the transcript the State elicited evidence concerning "burning bodies." Due to Jenkins' failure to comply with App.R. 16, we are unable to consider this argument. See State v. Eisenhaurer,
Stark App. No. 1998CA00333, 1999 Ohio App. LEXIS 3458.
 {¶ 62} In arguing that the State improperly presented evidence that Jenkins failed to contact the police to give a statement, Jenkins refers to specific pages of the transcript. However, Jenkins refers to Officer Harper's testimony that the police received written statements from Martin and Sharp and an oral statement from Latham. The officer never mentioned not receiving a statement from Jenkins. Therefore, we find nothing prejudicial about the State's questions to Officer Harper.
 {¶ 63} Jenkins also refers to the testimony of Det. Cleveland, who was asked, "And did Tonica Jenkins or Tonica Clement ever contact you at the police department?" Before Det. Cleveland answered, defense counsel objected, and the trial court sustained the objection. Although this particular question may have been improper, because the court summarily sustained the objection before the witness could answer, we do not find any prejudice to Jenkins.
 {¶ 64} Finally, Jenkins argues the prosecutor improperly mentioned during closing argument that Martin failed to testify about his involvement in this case. Jenkins again fails to refer to specific pages of the transcript where she claims such improper statements were made. Nonetheless, the only reference this court found in the record consisted of the following statement:
"The State has produced, put forth before you seventeenwitnesses. I'll put these up here as I talk about them. Seventeenwitnesses that the State has called. You heard from sixteen ofthose witnesses, and let me just ask you to bear with me here asI, as we talk about the witnesses, the evidence and maybe how youshould take all this in."
 {¶ 65} The prosecutor then presented his argument based on the evidence. He never specifically mentioned that Kyle Martin refused to testify because he invoked his Fifth Amendment right against self-incrimination. We cannot say that this statement, by itself, deprived Jenkins of a fair trial.
 {¶ 66} Accordingly, the fifth assignment of error is overruled.
 "Other Acts" Testimony {¶ 67} In her sixth assignment of error, Jenkins argues the trial court erred by admitting "other acts" testimony. Specifically, Jenkins argues the trial court erred by allowing testimony about her home detention through the Florida court and her federal drug case. Evid.R. 404(B) provides:
"Other crimes, wrongs or acts. Evidence of the other crimes,wrongs, or acts is not admissible to prove the character of aperson in order to show that he acted in conformity therewith. Itmay, however, be admissible for other purposes, such as proof ofmotive, opportunity, intent, preparation, plan, knowledge,identity, or absence of mistake or accident."
 {¶ 68} Similarly, R.C. 2945.59 provides that evidence of other crimes may be admissible to show "motive or intent, the absence of mistake or accident on [defendant's] part, or the defendant's scheme, plan, or system in doing the act in question."
 {¶ 69} Evid.R. 404(B) and R.C. 2945.59 are exceptions to the general rule which excludes evidence of previous or subsequent criminal acts by the accused which are wholly independent from the charges for which the accused is on trial. State v. Hector
(1969), 19 Ohio St.2d 167, 249 N.E.2d 912. Because they are exceptions, Evid.R. 404(B) and R.C. 2945.59 are strictly construed against admissibility. "Other acts" evidence may be admitted only if the other act tends to show by substantial proof any of those things enumerated in R.C. 2945.59 and Evid.R. 404(B). State v. Broom (1988), 40 Ohio St.3d 277,533 N.E.2d 682, paragraph one of the syllabus. The acts may or may not be similar to the crime at issue. Id.
 {¶ 70} As previously stated, the admission or exclusion of evidence lies within the trial court's sound discretion and will not be disturbed absent an abuse of discretion. Sage, supra, paragraph two of the syllabus.
 {¶ 71} Here, the evidence of Jenkins' federal drug case was admissible to show Jenkins' motive for attempting to murder Latham. The evidence showed that Jenkins searched for a female victim who resembled her. Jenkins drove Latham to a dental office to obtain x-rays in Jenkins' name for the purpose of using those x-rays to identify Latham's body. Latham testified that during the attack she heard Jenkins say she wanted to remove her ankle bracelet and put it on Latham. When this evidence is considered together with evidence of Jenkins' federal drug case, it becomes clear that Jenkins sought to avoid prosecution by feigning her own death using Latham's body. Under these circumstances, the evidence of Jenkins' federal drug case was relevant to show Jenkins' motive and intent.
 {¶ 72} Accordingly, the sixth assignment of error is overruled.
 Sufficiency of the Evidence and Manifest Weight of the Evidence {¶ 73} In her seventh assignment of error, Jenkins argues the trial court erred in overruling her motion for acquittal because her conviction was not supported by sufficient evidence. In her eighth assignment of error, Jenkins argues her convictions were against the manifest weight of the evidence. Although these arguments involve different standards of review, we consider them together because we find the evidence in the record is equally applicable to both.
 {¶ 74} Crim.R. 29(A) governs motions for acquittal and provides for a judgment of acquittal if the evidence is insufficient to sustain a conviction. An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259,273, 574 N.E.2d 492. A verdict will not be disturbed on appeal unless reasonable minds could not reach the conclusion reached by the trier of fact. Id. In essence, sufficiency is a test of adequacy. State v. Thompkins, 78 Ohio St.3d 380, 386-387,1997-Ohio-52. A criminal conviction is not supported by sufficient evidence when the prosecution has failed to "prove beyond a reasonable doubt every fact necessary to constitute any crime for which it prosecutes a defendant." State v. Robinson
(1976), 47 Ohio St.2d 103, 108, 351 N.E.2d 88, citing In reWinship (1970), 397 U.S. 358. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. State v. DeHass (1967),10 Ohio St.2d 230, 231, 227 N.E.2d 212.
 {¶ 75} The test to be applied when reviewing a claim that a conviction is against the manifest weight of the evidence was stated by the court in State v. Martin (1983),20 Ohio App.3d 172 at 175, 485 N.E.2d 717, as follows:
"There being sufficient evidence to support the conviction asa matter of law, we next consider the claim that the judgment wasagainst the manifest weight of the evidence. Here the test ismuch broader. The court, reviewing the entire record, weighs theevidence and all reasonable inferences, considers the credibilityof witnesses and determines whether in resolving conflicts in theevidence, the jury clearly lost its way and created such amanifest miscarriage of justice that the conviction must bereversed and a new trial ordered. * * * See Tibbs v. Florida(1982), 457 U.S. 31, 38, 42, 72 L.Ed.2d 652, 102 S.Ct. 2211."
 {¶ 76} (Emphasis added.) See, also, Thompkins, supra, at 387.
 {¶ 77} However, this court must be mindful that the weight of the evidence and the credibility of witnesses are matters primarily for the trier of fact, and a reviewing court must not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the State has proven the offense beyond a reasonable doubt. DeHass, supra at syllabus;State v. Eley (1978), 56 Ohio St.2d 169, 383 N.E.2d 132. The ultimate goal of the reviewing court is to determine whether the new trial is mandated. We should grant a new trial only in the "exceptional case in which the evidence weighs heavily against conviction." State v. Lindsey (2000), 87 Ohio St.3d 479, 483,721 N.E.2d 995, 1002.
 {¶ 78} Jenkins was convicted of attempted aggravated murder, felonious assault, kidnapping, conspiracy to commit aggravated murder, and tampering with evidence. R.C. 2903.01(A), which governs aggravated murder, provides that no person shall purposely, and with prior calculation and design, cause the death of another. R.C. 2923.02, the attempt statute, provides that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2903.11, which governs felonious assault, provides that "[n]o person shall knowingly cause serious physical harm to another."
 {¶ 79} R.C. 2923.01, which governs conspiracy, states in pertinent part:
"(A) No person, with purpose to commit or to promote orfacilitate the commission of aggravated murder, * * * kidnapping,* * * shall do either of the following:
 With another person or persons, plan or aid in planning thecommission of any of the specified offenses;
 Agree with another person or persons that one or more of themwill engage in conduct that facilitates the commission of any ofthe specified offenses."
 {¶ 80} R.C. 2905.01, which governs kidnapping, states in pertinent part:
"(A) No person, by force, threat, or deception, or, in thecase of a victim under the age of thirteen or mentallyincompetent, by any means, shall remove another from the placewhere the other person is found or restrain the liberty of theother person, for any of the following purposes:
* * *
(3) To terrorize, or to inflict serious physical harm on thevictim or another."
 {¶ 81} Finally, R.C. 2921.12, which governs tampering with evidence, states:
"(A) No person, knowing that an official proceeding orinvestigation is in progress, or is about to be or likely to beinstituted, shall do any of the following:
 Alter, destroy, conceal, or remove any record, document, orthing, with purpose to impair its value or availability asevidence in such proceeding or investigation."
 {¶ 82} The evidence set forth by the State supports Jenkins' convictions for each of these offenses. Latham testified that both Jenkins and Martin tried to kill her by striking her with a brick and injecting her with insulin. Although the substance in the syringes found in Jenkins' basement was not specifically identified as insulin, Latham's testimony was corroborated by Dr. Stephens, who testified that the insulin present in Latham's body was injected and was not the product of disease. Latham also testified that Martin and Jenkins held her against her will in an attempt to kill her. Physical evidence showed blood found on the brick and the file cabinet in Jenkins' basement matched Latham's DNA.
 {¶ 83} Further, several witnesses testified that Jenkins lied to the police by accusing Latham of stealing money from her. There was also evidence that Jenkins assisted Clement, who was attempting to clean Latham's blood from the basement floor, by delaying the police entry into the basement. Based on this evidence, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. We also conclude that the State presented sufficient evidence to support each of Jenkins' convictions beyond a reasonable doubt.
 {¶ 84} Accordingly, the seventh and eighth assignments of error are overruled.
 Sentencing {¶ 85} In her ninth assignment of error, Jenkins argues the trial court erred in sentencing her to consecutive prison terms without setting forth the mandatory findings required by R.C.2929.14(E)(4) and 2929.19(B)(2)(c).
 {¶ 86} Before imposing consecutive sentences, a trial court must make the findings contained in R.C. 2929.14(E)(4) on the record. State v. Echols, Cuyahoga App. No. 81113, 2002-Ohio-6820. First, the trial court must find that consecutive sentences are "necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public[.]" R.C.2929.14(E)(4). Secondly, the trial court must determine that one of the other factors listed in R.C. 2929.14(E)(4) also exists: (a) the offender was awaiting trial or sentencing or was under community control sanction, (b) the harm caused by the offenses was so great or unusual that a single prison term would not adequately reflect the seriousness of the offender's conduct, or (c) the offender's history of criminal conduct proves that consecutive sentences are needed to protect the public from future crime. State v. Johnson, Cuyahoga App. Nos. 81040-81042, 2003-Ohio-288.
 {¶ 87} Thus, R.C. 2929.14(E)(4) requires that the multiple terms not be disproportionate to the seriousness of the offender's conduct and the danger her conduct poses to the public, and the trial court is required to find that the offender's behavior fits one of the categories listed in R.C.2929.14(E)(4)(a), (b), or (c).
 {¶ 88} Once the trial court has made a category finding, the trial court must give its reason for imposing consecutive terms. R.C. 2929.19(B)(2)(c); State v. Edmonson (1999),86 Ohio St.3d 324, 326, 1999-Ohio-110. This court has interpreted Edmonson to require the sentencing judge to provide for the record both a "category finding" under R.C. 2929.14(C) and the reasons for that "category finding." State v. Berry,
(Mar. 9, 2000), Cuyahoga App. Nos. 75470-75471.
 {¶ 89} "Reasons" mean the trial court's basis for its "findings." Id. The failure to provide such information is reversible error requiring resentencing. State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165.
 {¶ 90} In sentencing Jenkins to consecutive sentences, the court stated:
"Miss Jenkins, the sentence that I'm going to give you I feelis commensurate and would not demean the seriousness of theoffenses which you've been found guilty of. You committed in myview the worst form of attempted aggravated murder. You conspiredor planned with others to commit murder, and you had no hesitancyabout committing this act whatsoever.
 Further you pose the greatest likelihood of committing futurecrimes not only based upon your dastardly acts committed in thiscrime but also based upon your past. You present as anarcissistic predator preying on the vulnerable to save your ownself. You have no regard for this woman's suffering or her painin this case. The method that you used to ploy your prey, thatis, the crack cocaine probably saved her life and your plan wasonce again exposed, so it is the Court's sentence as follows.
* * *
* * * This Court will not run it concurrently with thefederal sentence you are presently serving. I have imposedconsecutive sentences in this case because in my view while theseoffenses were being committed, you were awaiting trial in Floridaon another serious offense, and further the Court feels that asingle term would not in any way reflect the seriousness of yourconduct in this case."
 {¶ 91} As can be determined from the excerpts above, the court made the necessary findings to justify its consecutive sentences. It determined consecutive sentences were necessary to protect the public, that they were not disproportionate to Jenkins' conduct and the danger she posed by that conduct, and that the harm caused by these offenses was so great that the consecutive sentences were not disproportionate to the seriousness of the conduct. The court explained that it found Jenkins' conduct to be so dangerous because she conspired with others to murder the victim and she acted in a predatory manner while searching for a vulnerable victim to manipulate with crack cocaine. The court also noted that Jenkins showed no regard for the victim's suffering and suggested that Jenkins' apathy proved she was a danger to the public.
 {¶ 92} Finally, pursuant to R.C. 2929.14(E)(4), the court found not only that the harm caused by the offenses was so great or unusual that a single prison term would not adequately reflect the seriousness of Jenkins' conduct but it also found that Jenkins committed these crimes while awaiting trial in another serious case. Therefore, we find the court properly imposed consecutive sentences.
 {¶ 93} Accordingly, the ninth assignment of error is overruled.
 {¶ 94} The judgment is affirmed.
Judgment affirmed.
 KENNETH A. ROCCO, A.J., and JAMES J. SWEENEY, J. concur.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc. App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).
[1] Paulo Jabboure, D.D.S. identified a photo of Latham as the Tonica Jenkins who came to his office on April 20, 2001. Det. Curtis Jackson testified that during his interview with David Smith, he showed Smith a photo array of six black males. Smith could not identify any of the black males in the photo array. Det. Jackson then showed Smith photos of Jenkins and Clements. Smith positively identified the photo of Jenkins as the person with Michelle Sharp and an unidentified black male who came to his apartment on April 20. However, neither of these witnesses made an in-court identification of Jenkins.